# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued January 27, 2025        Decided August 1, 2025

No. 24-5098

RED LAKE BAND OF CHIPPEWA INDIANS, A FEDERALLY
RECOGNIZED INDIAN TRIBE,
APPELLANT

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN
SERVICES AND ROBERT F. KENNEDY, JR., IN HIS OFFICIAL
CAPACITY AS SECRETARY, U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:23-cv-00063)

---

*Steven D. Gordon* argued the cause for appellant. With
him on the briefs was *Philip Baker-Shenk*.

*McKaye L. Neumeister*, Attorney, U.S. Department of
Justice, argued the cause for appellees. With her on the brief
were *Brian M. Boynton*, Principal Deputy Assistant Attorney
General, at the time the brief was filed, *Matthew M. Graves*,
U.S. Attorney, at the time the brief was filed, and *Daniel Tenny*,
Attorney.

Before: HENDERSON, MILLETT, and WALKER, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WALKER.

WALKER, *Circuit Judge*: Federal law allows an Indian tribe to administer federally funded health programs. If those programs require a facility, the government "shall compensate" the tribe for using those facilities. 25 U.S.C. § 5324(*l*)(2).

A tribe may procure a facility in different ways. For example:

- Option 1: A tribe may rent a facility. It can then demand reimbursement from the government for the rent payment. It can do this indefinitely.

- Option 2: A tribe may use a facility that it owns. Under this option, the tribe can demand reimbursement from the government for the building's depreciation. Using those funds, it could pay for a new facility when the existing facility is no longer usable. So like Option 1, Option 2 provides the tribe with a facility indefinitely.

- Option 3: A tribe may borrow money to build a new facility. Under this option, the tribe can demand that the government reimburse the tribe for its loan payments. The tribe can use the facility until the end of its useful life, then borrow money to build a new facility, and then demand reimbursement for the new loan payments for the new facility. So like Options 1

and 2, Option 3 provides the tribe with a facility indefinitely.[1]

Each option "compensate[s]" the tribe *once*, not *twice*, for its costs. *Id.* If the government paid the tribe's costs twice, it would do more than "compensate" the tribe. *Id.*

In this appeal, a tribe named the Red Lake Band of Chippewa Indians wants the Government to pay for its costs *twice*. In particular, the Tribe wants the Government to pay for a healthcare facility's depreciation (recall Option 2) *and* for the Tribe's loan obligations on that facility (recall Option 3). So if the Tribe prevails, then at the end of the facility's useful life, the Government will have paid for the cost of the facility through depreciation, *and* the Government will have paid for the cost of the facility through loan payments. (At that point, the Tribe could build a new facility — which under the Tribe's theory, the Government would *again* pay for twice, through more depreciation and more loan payments.)

The Government agreed to compensate the Tribe for depreciation in 2020 and 2021, and for loan payments in 2022. But the Government declined to compensate the Tribe for *both* costs *each* year. The Government cited 25 C.F.R. § 900.70, which interprets the relevant statute to prohibit duplicative compensation.

We agree with the Government. In this context, depreciation and loan payments compensate for duplicative costs. And § 900.70 does not permit duplicative compensation.

---

[1] This list is not exhaustive.

**I**

**A**

The federal government funds health care, education, and policing on Indian reservations.  For many years, the federal government provided those services directly.  Then, in 1975, Congress passed the Indian Self-Determination and Education Assistance Act, Pub. L. No. 93-638, 88 Stat. 2203 (1975) (codified as amended at 25 U.S.C. § 5301 *et seq.*).

The Act gives tribes a choice.  Tribes can continue to receive services provided directly by the government.  *See* 25 U.S.C. §§ 5302(b), 5321(a)(1).  Or the government can pay tribes to "assume responsibility for aid programs that benefit their members."  *Menominee Indian Tribe of Wisconsin v. United States*, 577 U.S. 250, 252 (2016).

When a tribe elects to assume responsibility for a healthcare program, § 105(*l*) of the Act requires the government to "compensate" the tribe for any facility it uses to administer that program:

> (1) Upon the request of an Indian tribe . . . , the Secretary **shall enter into a lease with the Indian tribe** . . . that holds title to . . . a facility used by the Indian tribe . . . for the administration and delivery of services . . . .
>
> (2) The Secretary **shall compensate** each Indian tribe . . . that enters into a lease . . . .

25 U.S.C. § 5324(*l*) (emphases added).  That arrangement is known as a § 105(*l*) lease.

The Act specifies expenses eligible for "compensation" in a § 105(*l*) lease:

> Such **compensation** *may include* **rent**, **depreciation** based on the useful life of the facility, **principal and interest** paid or accrued, **operation and maintenance expenses**, and such **other reasonable expenses** that the Secretary determines, by regulation, to be allowable.

*Id.* § 5324(*l*)(2) (emphases added).

The agencies responsible for administering the Act promulgated regulations that supplement Congress's list and prohibit duplicative compensation:

> **To the extent that no element is duplicative**, the following elements **may** be included in the lease compensation:
>
> > (a) **Rent** (sublease);
> >
> > (b) **Depreciation** and use allowance based on the useful life of the facility based on acquisition costs not financed with Federal funds;
> >
> > (c) Contributions to a reserve for replacement of facilities;
> >
> > (d) **Principal and interest** paid or accrued;
> >
> > (e) Operation and maintenance expenses [including a list of examples];
> >
> > (f) Repairs to buildings and equipment;
> >
> > (g) Alterations needed to meet contract requirements;

(h) Other reasonable expenses; and

(i) The **fair market rental** for buildings or portions of buildings and land, exclusive of the Federal share of building construction or acquisition costs, or the fair market rental for buildings constructed with Federal funds exclusive of fee or profit, and for land.

25 C.F.R. § 900.70 (emphases added).

A second, related regulation gives a tribe three compensation options: The tribe may be compensated based on (1) the facility's "fair market rental"; (2) the § 900.70 elements; or (3) a combination of both, "provided that **no [§ 900.70] element of expense is duplicated** in fair market rental." 25 C.F.R. § 900.74 (emphasis added).

### B

Several hundred years ago, the Ojibwe and the Dakota fought for an area around Red Lake in Northwest Minnesota. The Ojibwe prevailed. Over time, the Red Lake Band of Ojibwe aligned with the Pembina Band of Chippewa Indians. They became the Red Lake Band of Chippewa Indians. Today, they are a federally recognized tribe whose members own and operate the Red Lake Reservation. *See Tribal History & Historical Photos*, Red Lake Nation, https://perma.cc/FGD8-7WQR.

On that reservation, the Tribe operates several substance-abuse health programs funded by the federal government under self-determination contracts. To carry out some of those programs, the Tribe built the Obaashiing Chemical Health Treatment Center. It cost $5.8 million.

The Tribe paid for about $850,000 of that cost. It financed the rest with a $4.95 million, 40-year loan from the Department of Agriculture. Under that loan, the Tribe annually owes about $200,000 in principal and interest.

**1**

Before the Treatment Center opened in December 2020, the Tribe submitted a lease proposal to the Indian Health Service, a subdivision of the Department of Health and Human Services. For simplicity's sake, we'll refer to the Indian Health Service as the Government. The Tribe and the Government attempted to negotiate a one-month lease for December 2020 and a year-long lease for 2021.

During those negotiations, the Tribe requested nearly $1 million in total annual lease compensation. The Government agreed to most of the Tribe's demands, but it refused to compensate the Tribe for both (1) a depreciation expense *and* (2) principal-and-interest payments on the Tribe's loan. The Government informed the Tribe that those elements were "impermissibly duplicative." JA 121.

Later, the Government's final-decision letter for 2020 and 2021 concluded that it lacked the authority to "repay a construction loan furnished by another federal agency" — here, the Department of Agriculture. JA 48 (capitalization altered). So the final-decision letter did not mention the Government's concern about duplicative compensation. Rather, because the Government believed it could not compensate the Tribe for its loan payments, the Government compensated the Tribe for depreciation only.

**2**

For 2022, the Government changed its position. It conceded that payments on the Tribe's loan may be a component of a § 105(*l*) lease. But it reiterated its duplication concern.[2] This time, the Government had to choose which element to compensate. It compensated the Tribe for the more valuable element: the loan payments.

Recognizing that the Tribe would have received more compensation in 2020 and 2021 under its revised rationale, the Government offered to swap depreciation with principal and interest for 2020 and 2021. That modification would have raised the Tribe's overall compensation by about $57,000.

Rather than accept that offer, the Tribe sued. It sought compensation for depreciation expense *and* principal-and-interest payments for 2020, 2021, 2022. It alleged that the Government had provided only partial compensation and sought the difference of more than $270,000 in damages.

After cross-motions for summary judgment, the district court ruled for the Government. It concluded that, with respect to the portion of the building financed by the $4.95 million loan, depreciation and principal-and-interest payments were duplicative. So the court upheld the Government's decision to decline the Tribe's depreciation request for 2022.[3]

---

[2] That duplication, of course, affected only the portion of the building financed by the loan, so the Government *did* compensate the Tribe for depreciation as to the portion of the facility it financed with its own funds.

[3] The district court declined to answer a separate legal question regarding depreciation: whether 25 C.F.R. § 900.70(b)'s instruction

The district court also upheld the Government's 2020 and 2021 decision, rejecting the Tribe's assertion that the Government forfeited reliance on the anti-duplication rationale for those years when the Government omitted that rationale from its final decision letter.

The Tribe appeals.[4]

## II

The Government's 2022 decision was correct.

## A

Duplicative compensation is prohibited by 25 C.F.R. § 900.70. Compensation for depreciation and principal-and-interest payments is duplicative because each independently makes the Tribe whole. So the Government correctly declined to compensate the Tribe for both.

To see why, start with the terms' meanings.

---

that depreciation can be considered only for "acquisition costs not financed with Federal funds" is consistent with the Indian Self-Determination and Education Assistance Act. *Red Lake Band of Chippewa Indians v. Department of Health & Human Services*, 718 F. Supp. 3d 50, 60 n.2 (D.D.C. 2024) (quoting 25 C.F.R. § 900.70(b)). We similarly decline to reach this question.

[4] To obtain summary judgment, the movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "We review de novo the district court's grant of summary judgment, applying the same standards that governed the district court's decision." *Navajo Nation v. Department of Interior*, 57 F.4th 285, 291 (D.C. Cir. 2023) (quoting *Electronic Privacy Information Center v. Department of Justice*, 18 F.4th 712, 717 (D.C. Cir. 2021)).

Depreciation is the "decline in an asset's value because of use, wear, obsolescence, or age." *Depreciation*, Black's Law Dictionary (12th ed. 2024). Although accountants consider this a "cost" that must be "spread over the expected useful life of the facility," depreciation does not result in a cash outflow. *See* Financial Accounting Standards Board, Accounting Standards Codification, § 360-10-35-4 (2025).

Principal, on the other hand, is the sum of money borrowed under a loan. The borrower must repay it, usually with interest. Generally, a repayment plan combines principal and interest into uniform periodic payments based on an amortization schedule.[5]

These definitions show that depreciation and principal can be economically duplicative: Both account for the cost of building a facility. Depreciation expresses that cost in terms of its lost value over time, while principal expresses it in terms of the debt incurred to build the facility.

The Tribe insists that depreciation and principal are not "duplicative" because depreciation and principal are *conceptually* distinct. True, but § 900.70 uses "duplicative" in an *economic* sense. In that regulation, "compensation" describes the cost incurred by the Tribe to acquire and maintain the facility — in other words, the amount of money that places the Tribe in the same position it would be in if it did not use the facility. 25 C.F.R. § 900.70. Depreciation and

---

[5] With each payment, the principal component increases and the interest component decreases. For example, under the Tribe's loan, the first payment included $69,437 of principal and $136,186 of interest, while the Tribe's final payment will include $200,117 of principal and $5,506 of interest. JA 105.

principal are both proxies for that amount. *Id.* § 900.70(b) & (d).

Context confirms this conclusion. The Act requires the Government to "compensate" a tribe for a facility's use. 25 U.S.C. § 5324(*l*)(2). To "compensate" means to make whole — or, to put a perhaps unnecessarily finer point on it, to make whole *once*. *See Compensation* (def. 2), Black's Law Dictionary (12th ed. 2024) ("In theory, compensation makes the injured person whole."). For the purposes of a regulation that requires "compensation," it does not matter whether you conceptualize that make-whole payment as principal or as depreciation. *See* 25 C.F.R. § 900.69. Once the Tribe has been made whole (once), it has been "compensate[d]" for the cost of using its facility to deliver health services. 25 U.S.C. § 5324(*l*)(2).[6]

In short, compensation for depreciation and principal is economically duplicative. And § 900.70 prohibits economically duplicative compensation. So the Government

---

[6] *See Tri-State Business Machines, Inc. v. Lanier Worldwide, Inc.*, 221 F.3d 1015, 1018 (7th Cir. 2000) ("It is a fundamental tenet of the law of contract remedies that . . . an injured party should not be put in a better position than had the contract been performed." (quoting E. Allan Farnsworth, *Contracts* § 12.8, at 874-75 (2d ed. 1990))); *Duran v. Town of Cicero*, 653 F.3d 632, 639 (7th Cir. 2011) ("a plaintiff may receive only one full compensation for his or her injuries, and double recovery for the same injury is not allowed" (cleaned up)); *McDermott v. Middle East Carpet Co.*, 811 F.2d 1422, 1429 (11th Cir. 1987) ("Double recoveries for one injury are not permitted . . . ."); *cf.* Restatement (Third) of Torts: Remedies § 3(a) (A.L.I., Tentative Draft No. 1, 2022) ("a plaintiff cannot recover an amount of compensatory damages that exceeds one full compensation for each harm that plaintiff suffered").

did not err in declining to pay the Tribe for both depreciation and principal-and-interest payments.[7]

**B**

To escape that conclusion, the Tribe offers several arguments. None persuades.

*First*, the Tribe says the Indian Health Service — what we have been calling the Government as shorthand — must compensate the Tribe for both depreciation and loan payments to align with the practice of a *different* agency, the Bureau of Indian Affairs. But the Tribe has not shown that the Bureau of Indian Affairs considered the key legal question in this case. In any event, one agency's incorrect legal interpretation does not bind other agencies, even if those agencies prefer to "uniformly interpret[ ]" jointly promulgated rules. Appellant Br. 24-25 (quoting 61 Fed. Reg. 32482, 32496 (June 24, 1996)).

*Second*, according to the Tribe, analogous statutory provisions require compensation for both depreciation and loan payments. But the Tribe's examples — a repealed provision regarding the Postal Service and a statute about airport fees — don't do what the Tribe says they do. Neither law uses the term "compensation." The postal law addressed the Postal Service's revenue streams. *See* Postal Reorganization Act, Pub. L. No. 91-375, sec. 2, § 3621, 84 Stat. 719, 760 (1970) (repealed by Pub. L. No. 109-435, § 201, 120 Stat. 3198, 3200 (2006)). And the airport-fees law contains an *illustrative* list of potential elements for landing fees. *See* 49 U.S.C. § 49104(a)(9).

---

[7] This assumes the Government's compensation methodology remains the same throughout the 40-year loan period (and by consequence, the 39-year depreciation period).

*Third*, the Tribe says that no private lessor would accept the amount offered by the Government. But the Tribe could have asked the Government to compensate it for the facility's "fair market rental" value. 25 C.F.R. § 900.74(a). Tellingly, it did not.

*Fourth*, the Tribe insists that without depreciation, it will lose money on the approximately $856,000 it invested from its own funds because it could have invested those funds at a 5% interest rate. But this dispute is about lease compensation relating to the Tribe's $4.95 million loan. In the future, the Tribe is free to ask the Government for a return on its $856,000 investment as a compensation element. We express no opinion about the merits of that hypothetical request.

*Finally*, the Tribe suggests that the regulation is inconsistent with the statute by emphasizing that § 5324(*l*)(2) lists both "depreciation" and "principal and interest." It contends that the Government must compensate it for each enumerated element, even if the elements cover the same expense. But the statute's language is permissive, not mandatory — "compensation *may* include" the enumerated elements. 25 U.S.C. § 5324(*l*)(2) (emphasis added). These "listed examples" are merely "intended to provide 'reasonable' compensation benchmarks." *Jamestown S'Klallam Tribe v. Azar*, 486 F. Supp. 3d 83, 92 (D.D.C. 2020). It's a menu, not a checklist.

Moreover, there is a good reason "depreciation" and "principal and interest" are listed separately. It's not that the Government must always pay for both; it's that each may or may not be relevant, depending on the situation. For example, if the Tribe had purchased the entire facility with cash, there would be no loan payment. In that case, depreciation would be an available method to determine adequate compensation.

In short, the Tribe's position is inconsistent with the Act and its implementing regulations.[8]

**III**

For the reasons above, the Government correctly declined to compensate the Tribe for both its payments on the Tribe's loan *and* the depreciation associated with that amount of the loan. This resolves the Tribe's challenge to the Government's 2022 decision. There is, however, a wrinkle regarding the Government's decision for 2020 and 2021.

As described above, the Government's decision for 2020 and 2021 rested on the legal theory that the Government cannot reimburse the Tribe for principal-and-interest payments paid to another federal agency. The Government has since abandoned that theory, so that decision must be vacated and remanded. On remand, the Government can do what it has represented that it would do even without vacatur and remand — apply its anti-duplication rationale and revise its decision for 2020 and 2021 to match its decision for 2022.[9]

---

[8] The Tribe's briefing refers to the Act's codification of "the interpretive canon that statutes must be construed liberally in favor of the Indians." *Fort McDermitt Paiute & Shoshone Tribe v. Becerra*, 6 F.4th 6, 14 (D.C. Cir. 2021) (cleaned up); *see* 25 U.S.C. § 5321(g). But this codified canon, like its uncodified cousin, "applies only when a statute is ambiguous." *Fort McDermitt*, 6 F.4th at 14. And here, there is no ambiguity.

[9] The Tribe mistakenly believes that if the decision about 2020 and 2021 is invalid, then the agency must accept its original proposal because the statutory 90-day window for a decision is now closed. But the statutory timeline resets when a challenger prevails in partially invalidating an agency's decision. *See, e.g.*, *Ethyl Corp. v. Browner*, 989 F.2d 522, 524 (D.C. Cir. 1993) ("given the tradition of

15

* * *

We affirm the district court's judgment as to 2022. We reverse the district court's judgment as to 2020 and 2021, with instructions to vacate the Government's decision and remand the matter to the agency for further proceedings.

*So ordered.*

---

allowing agencies to reconsider their actions where events pending appeal draw their decision in question, we see no basis to extend Congress's remedy for delay into a similarly radical remedy for error"). This principle has previously been applied to § 105(*l*) leases, and we apply it again today. *Maniilaq Association v. Burwell*, 170 F. Supp. 3d 243, 256 (D.D.C. 2016) ("the Court thinks it appropriate to compel the parties to discuss, in a manner consistent with this opinion, the proper amount of compensation for the [§ 105(*l*)] lease"); *Pyramid Lake Paiute Tribe v. Burwell*, 70 F. Supp. 3d 534, 545 (D.D.C. 2014) ("[W]hile the Court will issue an order declaring that the Secretary violated the [Act] by denying the Tribe's proposal outright, it will not direct her to enter into the Tribe's contract at the 2012 amount. Rather, it will direct the Secretary to negotiate with the Tribe . . . .").